## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CARRIE JONES,

        Plaintiff,

v.                                                                No. CIV 04-16 RLP

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Carrie Jones ("Jones") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Jones was not eligible for disability insurance benefits ("DIB"). Jones moves this Court for an order reversing or remanding for a rehearing.  [Doc. Nos. 15, 16.]

Jones was born on May 28, 1946 and was 57 years old when the administrative hearing was held.  She attained a high school degree and attended college for two years.  [Tr. at 15.]  Jones is married, and her 22-year old son lives with her.  She has past relevant work experience as a customer service operator and worked for Sprint PCS for four years before quitting her position on March 7, 2002.  [Tr. at 45.]

On May 7, 2002, Jones applied for DIB due to stress-related cluster headaches, an inability to concentrate and loss of memory.  [Tr. at 62.]  She also stated that trying to fill out the disability application forms was very tiring and painful to her eyes.  [Id.]  Jones asserted that she stopped

working because of her "stressful job related to [her] eye condition . . ., menopause, loss of concentration, memory loss." [Id.] She alleged an onset date of March 7, 2002. [Tr. at 15, 45.] On June 4, 2003, the Administrative Law Judge ("ALJ") held an administrative hearing, during which Jones was represented by a non-attorney. [Tr. at 14, 255.] At the hearing, Jones testified that she was unable to work because of fibromyalgia, depression, aches in her pelvis, lower back, left hand, and shoulders, tingling in her fingers, numbness in her wrists, pressure points in the shoulder area and eye problems.

On August 15, 2003, the ALJ issued an unfavorable decision, denying Jones' request for benefits. [Tr. at 14-20.] The ALJ determined that Jones could return to her past relevant work, although she probably should not return to the same employer due to stress. According to the ALJ, Jones could perform sedentary work. The ALJ did not require a vocational expert's testimony. The ALJ concluded that Jones was not disabled within the meaning of the Social Security Act and Regulations. [Tr. at 20.]

On November 15, 2003, the Appeals Council denied Jones' request for review. [Tr. at 5, 254.] This appeal followed. [Doc. No. 15.]

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the

---

[1] 20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[7] age, education and past work experience, she is capable of performing other work.[8]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

---

[2] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3] 20 C.F.R. § 404.1520(b) (1999).

[4] 20 C.F.R. § 404.1520(c) (1999).

[5] 20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6] 20 C.F.R. § 404.1520(e) (1999).

[7] One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8] 20 C.F.R. § 404.1520(f) (1999).

[9] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant nonexertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)). Nonexertional limitations can include mental impairments. The grids do not consider nonexertional limitations; therefore, if significant nonexertional limitations are present, the grids may not be applicable. Id. However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work." Id. (internal citations omitted.)

In this case, the ALJ did not reach step five of the sequential process, and instead concluded at step four that Jones could perform her past relevant work. Thus, the ALJ relied neither on vocational expert testimony[10] nor the grids which are typically used at step five.

---

[10]The ALJ's opinion states that Zalla Galya was present at Jones' hearing and testified as a vocational expert [tr. at 14]; however, based on the transcript of the hearing, Ms. Galya did not testify even though she was present at the hearing. [Tr. at 257.]

**Standard of Review and Allegations of Error**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In her decision, the ALJ made the following findings: (1) Jones had not engaged in substantial gainful activity since the alleged onset of her disability; (2) Jones had an impairment or combination

of impairments considered "severe", including perivasculitis of the eyes and chorioretinitis of one eye, but that her alleged mental impairment of depression was not severe; (3) Jones' impairments did not meet or medically equal one of the listed impairments; (4) Jones' allegations regarding her limitations were not totally credible; (5) the ALJ carefully considered all of the medical opinions in the record concerning the severity of the impairments; (6) Jones had the residual functional capacity of someone who could lift and carry 20 pounds occasionally and 10 pounds frequently, who could stand or walk 2 hours in an 8-hour work day; who could sit for 6 hours in an 8-hour workday with normal breaks, and who could not work around hazardous machinery or at unprotected heights; (7) Jones' RFC did not preclude the performance of work-related activities in her past relevant work as a customer service representative; (8) Jones' medically determinable bilateral perivasculitis and chorioretinitis of the left eye did not prevent her from performing her past relevant work; and (9) the ALJ ultimately concluded that Jones was not under a "disability" as defined in the Social Security Act. [Tr. at 19-20.]

## Summary of Jones' Work History and Medical Records

### A.   Work History

Jones worked as a cellular phone call trouble specialist and a customer service representative for Sprint PCS from about 1998 until 2002 when she claimed she was disabled.  She worked as a trainer at J.C. Penny from 1990 to 1998, and as a customer service representative from 1985 to 1990. [Tr. at 67, 71.]

### B.   Eye Conditions

Jones' medical records run from about 1988 through 2003.  The earlier medical records, from 1988 through 1995 primarily concern her eye problems.  Jones had cataracts removed in the 1980's

and was also diagnosed with chronic retinal vasculitis.[11]  [Tr. at 140-150.]  One medical record notes that she may have had sarcoidosis.[12]  [Tr. at 150.]  A 1992 medical record states that Jones' uveitis[13] was stable.  [Tr. at 139.]  In December 1995, Jones had no acute visual problems with the exception of needing new reading glasses to read find print.  [Tr. at 138.]  There are no additional medical records regarding Jones' eye treatment until 2000.

In November 2000, Jones sought a referral to an eye doctor after she had had a motor vehicle accident during which glass from the windshield hit her face, chest and abdomen.  [Tr. at 153.]  Jones encountered a visual change after the accident and was recommended to an ophthalmologist.  [Tr. at 152.]  In December 2000, she was seen at Eye Associates.  She complained of headaches for a few months.  [Tr. at 135.]  The diagnosis on December 19, 2000 was vasculitis.  [Tr. at 131.]

On January 23, 2001, Jones reported frequent headaches after working on computers for long periods of time.  The record notes that she had perivasculitis of uncertain etiology and chorioretinitis[14] that was inactive.  [Tr. at 129.]  The eye doctor examining Jones recommended that a scan of the body be done to rule out sarcoidosis.  [Tr. at 129.]  On April 3, 2001, Jones was seen at Presbyterian Hospital. The radiology report notes right retinal inflammation consistent with sarcoid involvement. However, such inflammation may also be present without sarcoid involvement of the retina.  [Tr. at

---

[11]Retinal vasculitis of the eye is typically the result of inflammation of the tiny blood vessels of the retina. It may range from mild to severe.

[12]Sarcoidosis is a disease that results from inflammation of tissues of the body.  It can appear in almost any body organ but typically starts in the lungs or lymph nodes.  The disease can appear suddenly and disappear. Sarcoidosis is thought to be associated with an abnormal immune response, but its cause is unknown.

[13]Iritis is a form of Anterior Uveitis – a term for an inflammatory disorder of the colored part of the eye.

[14]Chorioretinitis is an inflammation of the choroid and retina of the eye.  The symptoms are the presence of floating black spots and blurry vision.

179.]  On April 20, 2001, Jones was seen by Eye Associates.  The record indicates that her chorioretinitis was inactive and that she had slight iritis.  Her exam was mostly normal.  [Tr. at 127.] The medical records during this period continue to show questions as to whether she had sarcoidosis. [Tr. at 185, 181.]

On May 29, 2001, Jones complained of a right orbit ache and that her eye ached after about 1½ to 2 hours of computer work.  On June 25, 2001, a study of Jones' orbits was conducted, and it was normal.  There was no evidence of inflammatory mass or other abnormality in the orbits.  [Tr. at 196.]  Jones was out of work for about one week in late July 2001 because her chronic vasculitis in her right eye required an orbital biopsy.  Again, sarcoidosis was suspected.  [Tr. at 183.]  On July 24, 2001, Jones presented for a biopsy of the lacrimal gland to confirm or refute sarcoidosis.  [Tr. at 190.]  It appears that sarcoidosis was ruled out as of this date.  Jones' diagnosis was focal mild non-specific chronic inflammation with associated ductal ectasia.  [Tr. at 192.]  Jones, however, was still complaining of headaches as of July 30, 2001 and was having a difficult time reading fine print.  In late 2001, Jones also complained of stress at work and menopausal symptoms.  [Tr. at 174, 178.]

On December 4, 2001, Jones complained of a dull pain in her right eye and felt like she had strained her right eye.  She also reported a lot of stress on the job.  She wanted to see a mental health counselor for depression.  [Tr. at 173.]  On December 18, 2001, an Eye Associates' record notes that her biopsy of the eye was repeatedly negative and that much looked normal.  [Tr. at 125.]

In April 2002, Jones was again seen at Eye Associates complaining of pressure when working on the computer and blurriness in the morning.  The record notes that her perivasculitis and chorioretinitis were stable.  [Tr. at 122.]  In her disability report, dated April 5, 2002, Jones wrote

-8-

that she had stopped work at Sprint on March 7, 2002 because of her stressful job that was related to her eye condition, stress, menopause, and loss of concentration.  [Tr. at 61.]

On June 19, 2002, Jones wrote in her Daily Activities Questionnaire that driving bothered her eyes and that while working she needed to rest her eyes.  [Tr. at 87.]  She also said that she loved to read to her grandson but that her reading was limited due to eye problems.  She watched television but it too was limited because of her eye problem.  Jones could, however, see well enough when wearing glasses to watch TV, drive, read and use the computer.  [Tr. at 87.]

Jones' husband filled out a third-party daily activities questionnaire on June 24, 2002, in which he noted that his wife's typical day consisted of reading the bible, washing, doing laundry, doing crossword puzzles, watching TV, and shopping.  He said that Jones liked to read and listen to music.  Her biggest problem was when she was out in the sun because the sunlight bothered her eyes.  [Tr. at 99.]  Jones was an excellent cook who prepared all types of food.  She had problems with her vision when working at the computer screen.  According to her husband, Jones wanted to work again but was doubtful and fearful because of her vision.  [Tr. at 99.]

On June 26, 2002, Jones filled out a vision screening report.  She reported that her right eye hurt constantly and that she then had headaches.  Her left eye also began to hurt.  She rested her eyes and stopped focusing to avoid the pain.  She could see well enough to drive, read and watch television but she could not work at the computer anymore because of the need to focus.  Whenever she focused her eyes, she was in constant pain.  [Tr. at 97.]

On September 24, 2002, Dr. Amy Schmidt reported that a diagnosis of sarcoidosis had been "basically ruled out."  Jones had a lacrimal gland tumor.  On November 21, 2002, the physical RFC

assessment indicates that her vision was good at 20/30, although computer work caused eye strain and resulted in incapacitating headaches, according to Jones. [Tr. at 223.]

There are no medical records in 2003 regarding Jones' vision problems. At the administrative hearing, held June 4, 2003, Jones reported that she had to leave her work because of visual problems, blurriness and a number of other problems. [Tr. at 260.] She had tried a less concentrated type of work with a cut in pay but it did not help. [Tr. at 260.] She still complained of blurred vision, dull eye pain and an inability to read the bible when her eyes bothered her.

On September 22, 2003, Jones was seen by a rheumatologist, Dr. Susan Comer, at Lovelace. [Tr. at 250.] Jones reported a history of chorioretinitis and perivasculitis. A biopsy of the eye was done but the results were non specific.

### C.    Other Medical Problems

In 1999, Jones reported problems with swollen ankles. She had hypertension that was in good control in the past. On August 20, 1999, Jones was diagnosed with bilateral edema. Her hypertension was well controlled. On October 22, 1999, Jones' urinary frequency was causing problems on her job. She had diffuse arthritis and was given a work excuse for the day. [Tr. at 159-161.]

On January 6, 2000, Jones complained of urinary frequency and voiding small amounts, as well as pressure over her bladder for a period of three weeks. She was under considerable stress at work and having to work over time. She complained of right ankle pain from a sprain in November, but the record indicates she walked without a limp. [Tr. at 158.]

On September 21, 2000, Jones was seen at St. Joseph's for back pain secondary to a motor vehicle accident on September 13. She did not go to the hospital immediately after the accident, but

she had developed back and neck pain, along with forgetfulness.  Her back pain improved after seeing a chiropractor but she had some soreness of the paraspinal muscles.  She had seen a chiropractor for eight years for body aches.  Again, the record notes stress at work and states that Jones was having trouble handling the stress because of distractions and forgetfulness.  A CAT scan of the head was ordered, and it was normal.  X-rays of the lumbar spine showed mild degenerative changes but no acute abnormality.  [Tr. at 157, 164.]

On October 9, 2000, Jones was seen for complaints about the frequency of urination and follow up about her back pain.  She reported that her back pain was better.  The cause of her frequent urination was unknown.  Her blood test results were normal.  [Tr. at 156.]  On October 12, 2000, she complained of burning pain on urination and again, frequency of urination.  Her back pain was better, but her work did not allow her to go to the bathroom frequently.  [Tr. at  155.]

On November 22, 2000, she complained of neck pain and back pain after another motor vehicle accident occurred on November 21.  [Tr. at 153.]  Glass from the windshield hit her face, chest and abdomen.  She did not go to the hospital, but she developed neck pain.  [Id.]  A radiology report, dated November 24, indicates there was normal alignment of the cervical spine and no significant disc space narrowing.  There was mild narrowing of the right neural foramen from C4-C6. There was anterior spur formation in the thoracic spine but no acute abnormality.  Disc space at L5-S1 had narrowed.  The impression was degenerative disc disease at L5-S1 with facet arthritis.  [Tr. at 163.]

On November 29, 2000, she was seen again for persistent back pain and bilateral hip pain. She denied problems urinating or with bowel movements.  She had a history of sciatica, hypertension and cataract removal.  Her hypertension was stable.  [Tr. at 152.]

-11-

In 2001, a medical record indicates that Jones had a history of sarcoidosis.  [Tr. at 179.]  On April 9, 2001, Jones saw Dr. Schmidt.  She complained of poor sleep and visual changes.  The record indicates Jones was pleasant looking and was less stressed.  Her retinal problems were being evaluated, as was a diagnosis of sarcoidosis.  [Tr. at 176.]  A May 4, 2001 medical record shows that Jones had "questionable sarcoidosis."  [Tr. at 185.]  However, as stated *supra*, the diagnosis of sarcoidosis appeared to be ruled out in mid-2001.  [Tr. at 196.]

On November 14, 2001, Jones saw Dr. Schmidt complaining of stress and bowel problems.  She was stressed from work and had problems with concentration, fatigue and constipation.  She was menopausal.  [Tr. at 174.]  On December 4, 2001, the medical record indicates Jones was very tearful and depressed.  She had been demoted at her work and her self esteem was low.  [Tr. at 173.]  The record indicates that Jones probably needed two weeks off work and to begin taking anti-depressants.  On December 17, 2001, Jones reported that the Paxil was helping a little.  She had a little less trouble sleeping and a little more ability to concentrate.  She had been off work since December 4 and was not returning until January 14, 2002.  [Tr. at 172.]

On January 9, 2002, Dr. Schmidt noted that Jones looked less depressed.  She was engaging and calm.  Jones reported being able to concentrate, improved sleep and less of a low mood.  She had more energy and was going to return to work.  [Tr. at 171.]

On March 7, 2002, Jones quit her work at Sprint.  On March 9, 2002, Dr. Schmidt wrote a note addressed to whom it may concern that Jones had multiple medical problems but that she was able to work in a variety of situations effectively.  However, in the doctor's opinion, Jones should not work at Sprint.  [Tr. at 170.]  On March 12, the medical record indicates that Jones was finding it increasingly difficult to avoid having work affect her health negatively.  She was taking a number of

-12-

medications, including Paxil for "problematic depression" and Oxybutynin for urge incontinence. Dr. Schmidt wrote that Jones had most of the medical problems under control realizing that her continued employment at Sprint would be detrimental to her health. Jones was not anxious and seemed well rested. Dr. Schmidt also wrote: "I think at this point the patient does have the appropriate resolve that it is in her best interest for her good mental health which will improve her physical health to seek alternative employment." [Tr. at 168.]

On May 7, 2002, Jones applied for DIB. According to her daily activities questionnaire, Jones could do household chores and prepare food but it took her longer. She stated that she used to cook from "scratch" but now relied on prepared meals. Her joints were stiff in getting out of a car, but she was able to go shopping, to medical appointments and to pharmacies. She helped baby- sit a 5 year old grandson, and was able to do errands regularly. She needed assistance in getting places, and her husband or son drove her. Her energy level was very low as was her mental alertness. Jones was able to eat three times a day, clean, do laundry, and a little ironing although a lot of effort was involved. She was not able to complete all of her chores and needed to rest. Jones had no problem being around people. She loved being involved in Christian activities and teaching people the truth from God's word. She loved to read mostly bible-based publications. She had many spiritual friends who were supportive of her and helped her. She tried to attend all five Jehovah Witness meetings if she could. She was able to visit relatives on the east coast from June 4 to June 13, 2002. Jones reported that she had insomnia a lot but did not need help bathing or dressing. She had severe arthritis, an over-active bladder with severe burning and poor concentration with anxiety. She was unable to focus or concentrate, which is why she quit her job. She had never been hospitalized for emotional problems. She could not walk one block without stopping. She did not use any devices

to assist her to walk.  She could type and use the computer but focusing on the screen hurt her eyes.  [Tr. at 87-94.]

On June 26, 2002, Jones filled out a headache questionnaire stating that she had throbbing headaches every day.  She felt electric shocks.  Concentrating, focusing and stress made the headaches worse. Ibuprofen sometimes helped.  [Tr. at 102.] Jones also filled out a pain report.  She again complained of pain in her lower back, butt, and hips, along with headaches all day long. Breathing exercises and praying helped.  [Tr. at 80.]

On September 22, 2002, Jones went to the ER complaining of blood in the urine.  She also had low back pain and lower abdominal pain.  She thought she had a bladder infection.  The record also indicates for the first time that Jones believed she had fibromyalgia.  She stated that her pain had been present seven years.  [Tr. at 210.]

On September 24, 2002, Jones saw Dr. Schmidt for hypertension and some urge incontinence. The record notes that her work-up for eye problems had ruled out sarcoidosis.  Jones had a lacrimal gland tumor.  She complained of muscle aches and stiffness since March.  This got so bad that Jones reported she had to stop working in March.  She had never had a diagnosis of arthritis, but she was very stiff in the morning.  There was no joint swelling or warmth or redness observed.  Her urinary tract infection had not improved.  Jones told Dr. Schmidt that she thought she had fibromyalgia.  Dr. Schmidt wrote that "she possible could" and ordered a work-up for arthritis.  [Tr. at 215.]   A September 24, 2002 radiology report indicates that there was normal lumbar lordotic curvature present and normal height and alignment for lumbar vertebral bodies.  There was marked disc space narrowing and facet sclerosis at L5-S1 level.  There were very minimal degenerative change in the interphalangeal joints of the digits.

-14-

On October 16, 2002, Dr. James Rich saw Jones.  Her chief complaint was muscular aching and stiffness.  She had had a pain in the neck, shoulders and hips for four years.  She tied the onset of these problems to the beginning of her job with Sprint.  She noted decreased energy, more fatigue, and decreased ability to do daily activities.  She wondered if she had fibromyalgia.  She reported a lot of anxiety, insomnia, decreased happiness and satisfaction.  Jones apparently stopped some of her medication four months after she quit her job because she thought she could control her anxiety without medications after she stopped encountering work-related stress.  Dr. Rich observed that Jones did not appear depressed or flat.  There was no joint swelling on her extremities and "no evidence of any joint manifestations at all."  [Tr. at 203-04.]  Dr. Rich was doubtful that there was a serious or life threatening etiology for Jones' stiffness and aches.  He agreed to be her primary care doctor since she did not have one.  He started her on Amitryptyline for depression, fatigue and pain symptoms.  [Id.]

On November 21, 2002, a physical RFC Assessment was performed.  The assessment included limitations of occasional lifting of 20 pounds, frequent lifting of 10 pounds, ability to stand and walk for 6 hours, ability to sit for 6 hours, unlimited ability to push and pull.  Complaints of muscle aches and stiffness were noted.  Her vision was good at 20/30.  She should avoid work requiring computer work and constant stress.  There were no postural limitations, no manipulative limitations, and no visual limitations.  However, Jones should avoid concentrated exposure to machinery and heights.  [Tr. at 223.]

Also on November 21, 2002, Jones was given a mental health RFC assessment.  Her mental impairments were non-severe.  She was mildly restricted in daily living activities.  She had no difficulties with social functioning and mild limitations with concentration and pace.  She suffered no

episodes of deterioration and none of the "C" criteria were met.  The reviewing physician noted that Jones had a diagnosis of depression and that considerable stress had been generated with the Sprint job.  While the reviewing physician found Jones' allegations of decreased concentration and depression credible, she could not conclude they caused severe work limitations.  [Tr. at 230.]

On November 25, 2002, Jones was denied DIB.  [Tr. at 28.]  In the Reconsideration Disability Report, Jones reported that her headaches and eye problems were getting worse.  Her fibromyalgia flared up.  She was very depressed and had trouble with her memory and concentration.  Her shoulder pain was worse.  She was unable to do the grocery shopping for long due to severe pain and fatigue.  She was very confused and had body aches.  Her husband had to help her get up from the toilet.  [Tr. at 103.]

On December 30, 2002, she was seen by Dr. Haines for polyarthralgia, retinal inflammation, sleep disturbance and problems with concentration that Jones reported had increased over the past two years.  [Tr. at 246.]  Jones stated that she thought she had symptoms of fibromyalgia and that the doctors had not listened to her.  [Tr. at 247.]  Dr. Haines referred Jones to a rheumatologist.  [Tr. at 246.]

In January 2003, it appears that Jones was getting massage for her aches and pains.  On the intake form, Jones stated she had fibromyalgia.  [Tr. at 248-49.]  On January 17, 2003, the Social Security Administration denied Jones request for reconsideration, explaining that no additional evidence had been submitted and that Jones should be able to do her past work as long as it did not require much computer use.  [Tr. at 33, 37.]  In her request for hearing, Jones stated there were days when she could not get out of bed.  She was in severe pain, her bowel movements were bad, and she had memory loss.  She discussed her fibromyalgia symptoms and chronic fatigue, unrestful sleep, poor

concentration, joint and muscle pain, water retention, stiffness, Irritable Bowel Syndrome, ankle swelling and numbness of her legs and behind.  [Tr. at 109-113.]

On June 4, 2003, the ALJ held the administrative hearing.  Jones was represented by a non-attorney.  A vocational expert was present but did not testify.  [Tr. at 255.]  Jones testified that she had to leave her prior job because of her medical condition and illness.  [Tr. at 260.]  She could not concentrate, had vision problems and blurriness, required frequent trips to the bathroom and felt depressed.  She stated that she told her manager and human resources about these problems, and that they suggested she take a cut in pay and a demotion so as to do less concentrated work.  However, this did not help Jones.  [Tr. at 260.]

Jones also testified that she was unable to work because she felt she had fibromyalgia.  She had read some books and spoken to people who had that illness, and she felt she too had it, based on her symptoms.  [Tr. at 261.]  With respect to her eye condition, she testified that she had had a cataract removed from her right eye and a biopsy done to see whether it was cancerous, but that she still gets blurred vision.  [Tr. at 262.]  Jones explained that her eyes became strained, red, and teared up whenever she focused at a computer.

Jones further testified that due to her bowel problems, she had to stay in the bathroom up to 30 to 45 minutes or longer.  While she used to have to urinate frequently, now she had the urge but could not urinate and had to sit and wait for longer periods.  [Tr. at 262.]

Her inability to concentrate was such that she could not retain anything.  Jones testified that she had to read things over and over.  [Tr. at 262.]  She was able to perform fewer and fewer household chores and became confused when she drove to pick up a prescription or to a medical appointment.  [Tr. at 262-63.]

Jones testified that she could sit and lie down, but that she could not stand for long periods of time. She was unable to lift anything heavier than three pounds. [Tr. at 263-64.] She spent most of her days lying down and trying to read the bible when she could.

Jones' representative also asked her questions during the hearing. Jones testified that she could not squat or bend well and that she had balance problems. [Tr. at 265.] She had trouble kneeling and climbing stairs, raising her arms and hands and gripping things. [Tr. at 266.] Jones stated she did not have the strength to open jars and could not do yard work or gardening. [Tr. at 267.] Jones had trouble getting out of the bathtub and could no longer zip up her clothes. The weather affected her, and she became depressed with wind and rain. She constantly ached. [Tr. at 268-69.]

With respect to her depression, Jones testified that she tried to snap out of it and that she felt badly that she was unable to work and contribute to the household. [Tr. at 270.] Her husband had retired but had had to come out of retirement to help out. According to Jones, she would love to work and loved being with people. [Tr. at 270.]

On August 15, 2003, the ALJ issued the unfavorable decision. [Tr. at 14-20.] Subsequently, on September 22, 2003, Jones saw a rheumatologist at Lovelace. She complained that she felt she might have fibromyalgia because of chronic fatigue and hurting all over, stiffness and exhaustion. The medical record indicates that Jones' pain began in 1988[15] and worsened after two successive car accidents in 1999 and 2000. She was using a cane at this time, had lost 20 pounds recently and weighed 227 pounds. She had trigger point tenderness in 18 out of 18 points on her back, forehead

---

[15]The medical record may have a typographical error as to the year, which may have been 1998 rather than 1988.

and chin.  She showed marked tenderness in her shoulders, bicipital tendons, elbows and wrists.  Her ankles and joints were tender.

Dr. Comer's impression was myofacial pain with 18 out of 18 trigger points, sleep disturbance, significant memory problems, confusion and depression, consistent with fibromyalgia. She recommended Amitryptyline for sleep and suggested Jones switch from the more expensive Paxil to Prozac so that she could be dosed better for significant depression.  The doctor discussed exercise as the best bet for helping Jones along with aggressive treatment for her depression.  The medical records states: "She will be appealing her disability denial.  I do believe it would be excellent for her to obtain disability to allow her to have the means of treating the depression that is impacting the fibromyalgia and memory problems and interfering with her ability to work."  The doctor recommended Jones continue using the cane.  [Tr. at 250.]

On October 16, 2003, Jones requested review of the ALJ's decision.  [Tr. at 254.]  On November 15, 2003, the Appeals Council denied the request.  The recent Lovelace record was reviewed by the Appeals Council.  [Tr. at 5, 8.]

## Discussion

In this appeal, Jones asserts the ALJ's decision was not supported by substantial evidence and was contrary to law.  Specifically, Jones contends that the following findings by the ALJ were erroneous: (1) she lacked credibility; (2) she had the residual functional capacity to lift and carry 20 pounds, etc.; (3) her RFC did not preclude her ability to perform her past work; and (4) her medically determinable eye problems did not prevent her from performing her past relevant work.  The Commissioner claims that Jones did not meet her burden of proving that she was precluded from performing her past work as a customer service representative during the pertinent 12 month period

-19-

(March 7, 2002-August 15, 2003), and that the Commissioner's findings were consistent with the Social Security Act and regulatory criteria.

## I.     CREDIBILITY FINDINGS

This Court recognizes that in terms of credibility decisions, it should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir.1991). "Credibility is the province of the ALJ." Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1499 (10th Cir.1992).

Here, Jones argues merely that the ALJ's credibility findings were erroneous.  Although she does not specify which credibility findings were erroneous, she appears to argue generally that those findings were erroneous with respect to the ALJ's RFC determination.  Moreover, because the ALJ does not specify which aspects of Jones' subjective complaints she found lacking in credibility, it was difficult for Jones to challenge specific credibility determinations.

It is true that the ALJ discussed a number of the medical records at length, along with Jones' testimony at the administrative hearing.  However, then the ALJ stated only that Jones' testimony was not wholly credible because the medical evidence did not support the severity of the symptoms that Jones reported.  Other than discussing Jones' self-diagnosed fibromyalgia, the ALJ did not discuss which of Jones' testimony about many other alleged symptoms lacked credibility.  The ALJ proceeded to state that she found the subjective complaints of Jones to be credible to the extent they were compatible with the RFC described in the opinion.  This appears to be boilerplate language and conclusory.  The credibility findings simply are not "closely and affirmatively linked to substantial evidence" in the record; instead, they appear to be more akin to conclusions in the "guise of findings." See Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).  Because of the lack of specificity of the

ALJ's credibility findings, the Court cannot determine whether substantial evidence supports those findings.  Accordingly, the case will be remanded for more detailed credibility findings that are "closely and affirmatively linked to substantial evidence."

## II.   RETURN TO PAST RELEVANT WORK

"At step four, the ALJ engages in a comparative assessment of the claimant's RFC and the demands of the work the claimant had done in the past to determine whether the claimant can do [her] past relevant work."  Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).

At step four, the ALJ "has no obligation to question a vocational expert if the claimant can return to past relevant work," and an ALJ is not required to "utilize information provided by a VE as to the requirements of a claimant's past work."  Kepler v. Chater, 68 F.3d 387, 392 (10th Cir. 1995); Potter v. Sec'y of Health & Human Servs., 905 F.2d 1346, 1349 (10th Cir. 1990).  However, the Commissioner has a "basic obligation" to fully investigate the physical and mental demands of a claimant's past work and compare them to her current capabilities.  Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1998).  In Henrie, the Tenth Circuit held that it was the claimant's burden at step four to establish her inability to perform past work but that the ALJ must make the requisite inquiry regarding the exertional demands of claimant's prior work. Id.  The Commissioner may use the services of a VE or the Dictionary of Occupational Titles to obtain evidence in order to determine whether the claimant can perform the past relevant work. Potter, 905 F.2d at 1349.

In Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996), the Tenth Circuit articulated three phases the ALJ must address to make the step-four determination.  In the first phase, the ALJ must evaluate the claimant's RFC.  The second phases consists of the ALJ's analysis of the demands of the

past relevant work.  In the third phase, "the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one."  Id.  Specific findings are required at all phases.  Id.

Here, the ALJ determined Jones' RFC, but she failed to set forth specific findings at phases two and three.  In other words, the transcript of the hearing is devoid of any inquiry regarding the nature of, and physical or mental demands associated with Jones' prior relevant work.  There was no inquiry into her ability to work as a customer service representative, or what the demands of that job include.  In addition, there was no comparison of Jones' prior work with her capabilities.

The ALJ's decision merely states that Jones could return to her previous occupation but not for the same employer.  The ALJ also found that Jones could perform sedentary work and that the customer representative occupation is sedentary.  Yet, it is unclear from what information the ALJ concluded the job was sedentary.  Jones herself described the position as she performed it for one employer as consisting of two hours sitting, two hours standing, and two hours walking.  [Tr. at 71, 72.]

In addition, Jones complained consistently and regularly to medical health care providers of many physical and emotional complaints, including vision problems that might affect her ability to perform the duties of a customer service representative.  For example, there is no discussion by the ALJ as to what amount of computer screen usage would be required in that position, and whether a comparison of Jones' limitations would allow her to do that type of work.

For these reasons, the Court cannot determine whether substantial evidence supports the ALJ's determination that Jones' RFC did not preclude her from performing her prior relevant work.  Thus, the Court finds it necessary to remand to develop an adequate record on these matters.  In

other words, the ALJ must fully investigate the physical and mental demands of past work and compare them to Jones' capabilities, while keeping in mind that Jones bears the burden at step four of demonstrating she is unable to perform the past relevant work.  Upon remand, the ALJ should also make express findings regarding Jones' credibility.  In addition, the ALJ should consider the most recent medical evidence from Lovelace regarding Jones' diagnosis of fibromyalgia that was submitted to the Appeals Council.

Based on these conclusions, the Court does not find it necessary to reach any of Jones' additional arguments for remand, as they all are related to the RFC findings and her ability to perform her past relevant work.

IT IS THEREFORE ORDERED that Jones' motion to reverse and remand [Doc. No. 15] is GRANTED and that this matter is remanded to the Commissioner for the purpose of making credibility findings that are closely and affirmatively linked to substantial evidence and to make specific findings as to the demands of Jones' prior relevant work and her ability to perform those tasks.

_____
Richard L. Puglisi
United States Magistrate Judge
(sitting by designation)